IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GUY T. STRINGHAM,

    Plaintiff,                      No. CIV S-04-1530 DFL GGH P

    vs.

R. LEE, et al.,                         ORDER &amp;

    Defendants.                FINDINGS AND RECOMMENDATIONS

_____/

Introduction

       Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court is plaintiff's motion for preliminary injunctive relief, filed on March 3, 2005, to which defendants, who were granted extensions of time, filed their opposition on July 14, 2005. Plaintiff filed a reply on August 4, 2005.

Complaint

       Plaintiff names as defendants in this action, pursuant to 42 U.S.C. § 1983, R. Lee, J. Herrera, K. Providence, W. Fisher, G. Thumser, W. Bradanick, K. Allen, N. Grannis, S. O'Ran, and T. Schwartz. He also names as defendants, pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., the California Department of Corrections (CDC) and the California Medical Facility - Vacaville (CMF-Vacaville).

1

Plaintiff, a Type I insulin dependent diabetic, alleges that defendant CMF Correctional Officer (C/O) Lee, on August 16, 2003, twice refused him medical care while he was experiencing a serious insulin reaction and even after plaintiff had called "Man Down," used only during medical emergencies. Defendant Lee violated a state regulation prohibiting non-medical personnel from diagnosing or prescribing health care treatment for prisoners, CAL. CODE REGS. tit.xv, § 3354,[1] as well as plaintiff's constitutional rights under the Eighth and Fourteenth Amendments and his rights under the ADA. Complaint, pp. 2-4.

In addition to ignoring plaintiff's urgent requests for help, defendant Lee maliciously issued a CDC-115 Rules Violation Report (RVR) for "manipulation of staff" of which plaintiff was eventually found not guilty. Medical Technical Assistant (MTA) St. John (not a defendant) tested plaintiff when he finally got to the clinic at 1735 hours on 8/16/03, finding that plaintiff's blood sugar level was 52 and therefore, low, as normal blood sugar level range is 70 to 120. Upon retesting plaintiff at 1755 hours, after the MTA had sent him to eat, he found that plaintiff still tested low at 71, and found that plaintiff was having a "reaction." Complaint, p, 3, Exhibit 1-A. Once plaintiff began experiencing the insulin reaction, he required immediate caloric intake, and defendant Lee provided plaintiff no assistance. Complaint, pp, 3-4.

Defendants J. Herrera, S. O'Ran, G. Thumser, T. Schwartz, K. Allen, and N. Grannis all denied plaintiff's appeals, relating to defendant Lee's conduct and the resulting RVR, through the Director's Level. Complaint, p. 4. Lee's acts were apparently justified because he was following orders of defendant K. Providence, CMF Correctional Lieutenant, who was in turn acting on orders of defendant W. Fisher, another Corr. Lt. assigned as third watch commander on

---

[1] "Authorized staff. Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their licensure, to diagnose illness or, prescribe medication and health care treatment for inmates. No other personnel or inmates may do so." CAL. CODE REGS. tit.xv, § 3354(a).

8/16/03. These orders were based on an institutional memorandum authored by defendant W. Bradanick on March 16, 2000, which had not been applied to plaintiff previously due to his individually medically necessary treatments. Complaint, p. 5; Exhs. 4-6, 8. Plaintiff had been granted "preferential movement," i.e., his treatment was contrary to, or an exception to, the Bradanick memo, which exception had been renewed repeatedly through August 19, 2003, and, thus, was still in effect at the time of plaintiff's 8/16/03 insulin reaction and defendant Lee's misconduct. Id., pp. 5-6, Exhs. 4-6, 9. The Bradanick memo, dated 3/16/2000, restricts inmate movement, including those inmates going to the B-1 Clinic for finger sticks, by having them released "**only** when their respective wing is released for the morning or evening meals,"[2] apparently for the purpose of ameliorating "mass movement and security problems with inmates inside of and outside of the B-1 Clinic area." Exh. 8 to complaint. Notwithstanding the memo, on September 1, 2000, plaintiff was found by the Chief Medical Officer Andreasen (not a defendant) to meet the requirements to be released as a brittle diabetic for fasting blood sugar tests. Complaint, p. 14, Exh. 5. Plaintiff's medical chrono, CDC 128-C, signed by non-defendants, Dr. Mark Altcher and Dr. Joseph Bick, Chief Medical Officer (CMO), was dated August 20, 2002 and was to remain in effect for one year, until August 19, 2003, stated in relevant part: "Due to diabetes, he [plaintiff], needs to get to B-1 Clinic at 0630 and 1715 hours for fingersticks and insulin treatments, and should go the dining hall immediately thereafter." Exh. 4 to complaint.

Plaintiff is a Type I brittle diabetic, a condition recognized as a disability under the ADA. Compl., pp. 11-13. Defendant Fisher stopped the brittle diabetic release program in early 2003, focusing in a discriminatory manner only on diabetics. Id., p. 15. Evidence that defendant Fisher prevailed upon CMO Bick to exclude the release times is apparent in plaintiff's CDC-128 chrono, dated August 3, 2003 to remain in effect until August 4, 2004, wherein

---

[2] Emphasis in original.

plaintiff's Type 1 brittle diabetic condition and requirements are set forth but no release times for fasting blood sugar tests are identified, although such times had been specified in the four preceding years. Id. Plaintiff asks that the CMF reinstate the brittle diabetic release program, seeking only prospective injunctive relief from the entity defendants, CDC and CMF-Vacaville, including renewal of his CDC-128-C medical chronos on a yearly basis, to be released for timely medical testing and treatment and assurances that staff will respond appropriately to plaintiff's emergency medical calls. He seeks money damages, including punitive damages, from the individual defendants.

Preliminary Injunction Standard

        The legal principles applicable to a request for preliminary injunctive relief are well established. "The traditional equitable criteria for granting preliminary injunctive relief are: 1) a strong likelihood of success on the merits, 2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, 3) a balance of hardships favoring the plaintiff, and 4) advancement of the public interest (in certain cases)." Dollar Rent A Car v. Travelers Indem. Co., 774 F.2d 1371, 1374 (9th Cir. 1985). The criteria are traditionally treated as alternative tests. "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates 'either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.'" Martin v. International Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984) (quoting William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir. 1975)). The Ninth Circuit has reiterated that under either formulation of the principles, if the probability of success on the merits is low, preliminary injunctive relief should be denied:

> Martin explicitly teaches that "[u]nder this last part of the alternative test, even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits."

Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995) (quoting

1  Martin, 740 F.2d at 675).

2  In cases brought by prisoners involving conditions of confinement, any
3  preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the
4  harm the court finds requires preliminary relief, and be the least intrusive means necessary to
5  correct the harm." 18 U.S.C. § 3626(a)(2).

6  Motion for Preliminary Injunction

7  Plaintiff seeks a preliminary injunction granting the relief he seeks on a permanent
8  basis within his complaint. Motion, pp. 1-2. Plaintiff avers that his condition is chronic and
9  worsening. Plaintiff cites Armstrong v. Davis, 275 F.3d 849, 860-61 (9th Cir. 2001), in support
10 of his request for preliminary relief:

> First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury "stems from" that policy. Hawkins [v. Comparet-Cassani, 251 F.3d [1230] at 1237. In other words, where the harm alleged is directly traceable to a written policy, see Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir.2001), there is an implicit likelihood of its repetition in the immediate future. Second, the plaintiff may demonstrate that the harm is part of a "pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights." LaDuke v. Nelson, 762 F.2d 1318, 1323 (9th Cir.1985). Thus, where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the "realistic repetition" requirement.

18 Armstrong, supra, at 861.

19 Plaintiff concedes that while he does not have all of CMF's written policies, but
20 avers that the "drastic changes" in his CDC-128-C medical chronos demonstrate evidence of a
21 policy in violation of his federal rights. Motion, p. 3.

22 Opposition

23 Defendants protest that plaintiff is seeking a change in existing prison policy, at
24 least tacitly confirming plaintiff's contention that there is a prison policy which has eliminated
25 the brittle diabetic release program. Opp., p. 2. Defendants aver that the policy was instituted for
26 \\\\\

security reasons. Plaintiff's request that medical and correctional staff respond appropriately to his emergency calls, defendants maintain, because such procedures already exist at CMF. Id.

Defendants contend that CMF currently houses from 140 to 150 inmates who need to have finger-stick tests before they eat. Id., Exh. A, Declaration of Custody Kaplan, (hereafter Kaplan Dec.), ¶ 2; Exh. B, Declaration of Dr. Bick (hereafter, Bick Dec.)[3], ¶ 2. Defendants argue that, while in the past CMF allowed diabetics early release to go the clinic before meals, this release policy led to problems, such as diabetic inmates mingling with other inmates in other units, and, more troubling, diabetic inmates were distributing their insulin needles to other inmates for illegal drug use. Id., Kaplan Dec., ¶ 3; Bick Dec., ¶ 3.

Defendants maintain that CMF's diabetic policy has continued to evolve since the issuance of defendant Bradanick's 3/16/00 memo. Currently, diabetic inmates are released to the clinic at meal times only as advocated in the Bradanick memo and early release finger-sticks are not allowed. Defendants believe that releasing diabetics at other times "would create movement and security problems." Id., p. 2-3, Kaplan Dec., ¶ 4; Bick Dec., ¶ 3. Defendants, however, do not explain why, once the Bradanick memo was issued, an exception for brittle diabetics was made, at least until 2003, and at least as to this plaintiff.

Defendants downplay the significance of the August 16, 2003 incident, stating that CMO Bick went to the clinic at dinner time when his blood sugar level of 52, while below the normal 60 to 110 range, was not life-threatening and that the solution was for him was to eat something, which he did, retesting at 71, within normal limits. Id., p. 3, Bick Dec., ¶¶ 6-7. Despite the MTA's opinion that plaintiff was having a "reaction" or "insulin reaction," in fact plaintiff simply had hypoglycemia or a low blood sugar level before he ate. Id. Diabetics at CMF are provided with food or snacks in their cells to maintain their blood sugar between meals. Id.

---

[3] Kaplan and Bick are not defendants.

1        No evidence shows that plaintiff required any further medical care on 8/16/03 or
2 that plaintiff suffered permanent damage; any faintness or anxiety plaintiff may have had would
3 have been resolved by eating.  Nothing in plaintiff's medical record indicates that he will suffer
4 adverse medical consequences by getting fingersticks after 6:30 a.m. or 5:30 p.m., or at the time
5 the wing is released for meals.  Plaintiff need only get a fingerstick consistently every day and
6 afterward have enough time to eat.  Id., p.3, Bick Dec., ¶¶ 8-9.

7        CMF custody staff are trained to contact medical staff immediately when a true
8 emergency is involved; in non-emergencies, staff are trained to contact medical staff and arrange
9 for an inmate appointment.  Id., p.4, Kaplan Dec., ¶ 3; Bick Dec., ¶ 3.

10        Moreover, defendants contend that plaintiff is seeking a mandatory, not
11 prohibitory, injunction, requiring a change of prison policy, which must meet a higher standard;
12 that plaintiff is not threatened with irreparable harm and that he is unlikely to prevail on the
13 merits of his Eighth Amendment claims.  Opp., pp. 4-9.  Defendants aver that plaintiff's
14 allegations center on one allegation, that a guard made plaintiff wait approximately 15 minutes
15 before he was released to the clinic for testing and then eating, and this isolated occurrence does
16 not establish the requisite deliberate indifference under the Eighth Amendment.  Opp., p. 7.
17 Defendants do not reference his claims based on the ADA.

18 Reply

19        Plaintiff protests that defendants incorrectly focus solely on the August 16, 2003
20 incident, as he attached to his complaint a prison grievance setting forth that he has been subject
21 to "an abundance of insulin reactions," and depleted that extra food supply he receives from his
22 family on a quarterly basis due to the "new non-schedule" to which he has been subjected.
23 Reply, p. 2, referencing complaint, Attachments 1-C and 1-D.  Plaintiff also asserts that he does
24 not seek to change prison policy with respect to anyone but himself and thus no mass movement
25 concerns are implicated, and that there is no evidence that he ever mingled with other prisoners
26 or dispensed his hypodermic syringes to anyone.  Reply, p. 3.  He also asserts that his medical

7

chronos were not simply for the purpose of finger stick blood sugar tests, but also was for insulin injections/treatments and to go to the dining hall immediately thereafter; plaintiff takes a fast-acting insulin after which he must eat within 20 minutes. Id.; plaintiff's dec., p. 4; Exhs. 4, 6, 9 to complaint. Each of these medical chronos asserts that plaintiff needs to get to B-1 Clinic at 0630 [6:30 a.m.] and 1715 [5:15 p.m.] hours for fingersticks and insulin treatments, and should, immediately thereafter go the dining hall. Id. CMO Dr. Andreasen stated in the 2001 to 2002 chrono, dated 11/29/01, that "[t]his is for optimal glucose control and to prevent dangerously high or low blood sugars." Exh. 5 to complaint. In the 1999 to 2000 chrono, dated 12/29/99, non-defendants Drs. Anderson and Andreasen made or endorsed a similar medical assessment.

Plaintiff notes that defendants concede that plaintiff needs to get a finger stick on a consistent basis every day and then be allowed to eat. He sets forth a schedule for meal release times from July 30, 2003 to August 16, 2003 which show a range of time between 9 hours and 30 minutes to 13 hours and 34 minutes between meals. Reply, pp. 5-6. He states that CMO Dr. Bick is misleading when he states that plaintiffs are provided with food or snacks in their cells adequate to maintain their blood sugar between meals. Averring that plaintiff has only a bedtime snack provided to be eaten between the evening and morning meals, a snack which consists of one slice of bread, two pieces of fruit and two thin slices of lunchmeat and a mustard packet, which must provide the coverage for the 12 hours between dinner and breakfast, leaving nothing for the time between meals during the day. Reply, p. 6, plaintiff's affid., pp. 5-6. Plaintiff includes exhibits which are medical publications, which he asserts show that hypoglycemia causes cognitive impairments and that defendants stating that there being no record of injury in his medical file does not mean an injury has not occurred. Reply, p. 8.

Plaintiff claims to be subject to a blood sugar level that fluctuates precipitously and that it is likely that his blood sugar dropped at about 1 count per minute from the time that he notified defendant Lee of his low blood sugar on 3/16/03 and that a few minutes longer would have meant lost consciousness and even death. Reply, p. 9. Plaintiff fears that the situation is

1  likely to arise again if he is not allowed to resume the release program he had before, which had
2  been implemented and continued even if the face of the policy related to the Bradanick memo on
3  which defendants have relied.  Plaintiff maintains that the schedule of meal times are not fixed
4  and that his condition requires consistency and unfluctuating times each day for his tests, seven
5  days a week, 52 weeks a year.  Plaintiff sets forth the following (without clarifying to which unit
6  he belongs):[4]

> The prison policy regarding meal releases is this: Units One (1) through Four (4) utilize the main dining halls.  Unit 4 always eats first.  Units 1, 2, and 3 rotate monthly when they eat second, third and fourth, respectively.  Meaning, once a month the meal schedule changes from one (1) hour (if rotating from third to second) to two (2) hours (if rotating from second to fourth).  Each weekend (Saturday and Sunday) and holiday the morning meal commences (1) hour later, with no change to when the evening meal commences.  Lunches are served in bags with the morning meal.  If the first of the month (when the unit rotation schedule changes) lands on a weekend or holiday, the morning meal can be pushed as much as three (3) hours past when it commenced the previous day.

Reply, plaintiff's affidavit, pp. 4-5.

Plaintiff claims that under the inconsistency inherent in the existing prison policy, he cannot receive meals and treatments on a consistent basis daily, which consistency defendants concede that he needs.  Plaintiff also contends that Dr. Bick does not have first-hand knowledge of plaintiff as a patient, nor is he familiar with how wildly his blood sugar fluctuates because he has never had him as a patient.  Reply, pp. 10-12; affid., pp. 8-9.  Plaintiff also claims that the past early release program for diabetics is a program or service as described under the ADA, of which he is now being deprived.  Reply, affid., p. 10.  Finally, he declares that he was not able to receive his insulin shot when his low blood sugar was tested on 3/16/03 until after he had eaten, returned and been re-tested because the clinic will not administer an insulin shot to a patient with blood sugar below the court of 70.  Reply, affid., pp. 15-16.

---

[4] Since unit 4 apparently always eats first, it would be helpful to know if that time is more consistent and if plaintiff resides in that unit.

1 Discussion

2                 Legal Standard for Eighth Amendment Claim

3           In order to state a § 1983 claim for violation of the Eighth Amendment based on

4 inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

5 deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

6 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively

7 serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter,

8 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

9 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference."

10 Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

11           A serious medical need exists if the failure to treat a prisoner's condition could

12 result in further significant injury or the unnecessary and wanton infliction of pain. Indications

13 that a prisoner has a serious need for medical treatment are the following: the existence of an

14 injury that a reasonable doctor or patient would find important and worthy of comment or

15 treatment; the presence of a medical condition that significantly affects an individual's daily

16 activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900

17 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

18 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

19 grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

20           In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

21 defined a very strict standard which a plaintiff must meet in order to establish "deliberate

22 indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

23 However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

24 which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979.

25 Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

26 should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

1   It is nothing less than recklessness in the criminal sense––a subjective standard––
2   disregard of a risk of harm of which the actor is <u>actually</u> aware. <u>Id.</u> at 838-842, 114 S. Ct. at
3   1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn
4   that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837,
5   114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk
6   of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id.</u> at
7   847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his
8   knowledge of a substantial risk of serious harm." <u>Id.</u> at 842, 114 S. Ct. at 1981. If the risk was
9   obvious, the trier of fact may infer that a defendant knew of the risk. <u>Id.</u> at 840-42, 114 S. Ct. at
10  1981. However, obviousness <u>per se</u> will not impart knowledge as a matter of law.

11  Also significant to the analysis is the well established principle that mere
12  differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth
13  Amendment violation. <u>Jackson v. McIntosh</u>, 90 F.3d 330 (9th Cir. 1996); <u>Franklin v. Oregon</u>,
14  662 F.2d 1337, 1344 (9th Cir. 1981).

15  Moreover, a physician need not fail to treat an inmate altogether in order to violate
16  that inmate's Eighth Amendment rights. <u>Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir.
17  1989). A failure to <u>competently</u> treat a serious medical condition, even if some treatment is
18  prescribed, may constitute deliberate indifference in a particular case. <u>Id.</u>

19  Additionally, mere delay in medical treatment without more is insufficient to state
20  a claim of deliberate medical indifference. <u>Shapley v. Nevada Bd. of State Prison Com'rs</u>, 766
21  F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is
22  no requirement that the delay cause "substantial" harm. <u>McGuckin</u>, 974 F.2d at 1060, citing
23  <u>Wood v. Housewright</u>, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and <u>Hudson</u>, 112 S. Ct. at 998-
24  1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends
25  to provide additional support for a claim of deliberate indifference; however, it does not end the
26  inquiry. <u>McGuckin</u>, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

11

medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988). Plaintiff must provide expert evidence that the treatment he received equated with deliberate indifference. The dispositive question is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

ADA

The ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I), public services (Title II), and public accommodations (Title III). PGA Tour, Inc. v. Martin, 532 U.S. 661, 674, 121 S. Ct. 1879 (2001). Plaintiff makes his ADA claim pursuant to Title II.

Title II prohibits a public entity from discriminating against a qualified individual with a disability on the basis of disability. 42 U.S.C. § 12132. To state a claim of disability discrimination under Title II, the plaintiff must allege four elements: 1) the plaintiff is an individual with a disability; 2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's service, programs or activities; 3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and 4) such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability. Weinreich v. L.A. County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).

\\\\\

The failure of defendant Lee to provide plaintiff with adequate medical care does not state a claim pursuant to Title II of the ADA. Plaintiff's claim also appears to be that defendant Lee as well as the other defendants, particularly defendant Fisher, eliminated the brittle diabetic release program (at least as applied to him), to which he believes he was entitled under the ADA. However, plaintiff does not describe a service, program or activity offered to other inmates from which he was excluded; rather, he claims that a specialized program that applied to him and perhaps a few others has been eliminated and this is discriminatory against him (and other brittle diabetics), a claim that does not fall under the ADA. The court does not reach the merits of these allegations in the adjudication of the pending motion, but seeks to determine whether plaintiff demonstrates a likelihood of success on the merits. As to his ADA claim, there appears little such likelihood, but as to his Eighth Amendment claims, the question is significantly closer.

The gravamen of plaintiff's request for preliminary injunctive relief is that his condition requires having his blood sugar levels consistently tested twice a day, with follow-up insulin treatment and a meal, and that the prison's current policy, a policy from which he was medically exempted for approximately three years, does not guarantee the requisite consistency. Defendants concede that plaintiff does require consistent testing and eating daily but maintain that the current policy of not allowing plaintiff an early release at a set time every day does not significantly undermine that requirement.

Plaintiff's showing goes some way to demonstrate that there is definite fluctuation in the meal times to which he is subject under the current policy, and defendants' representations do not address any scheduled meal time inconsistency to which plaintiff may be subject from one day to the next. However, plaintiff has not identified any further incident with respect to his rapidly dropping blood sugar for which he did not receive immediate treatment upon his request. Nonetheless, the court recognizes that it is not necessary for plaintiff to suffer a similar incident before seeking preliminary injunctive relief if the conditions to which he is subject are likely to

place him in a precarious medical condition.

Notwithstanding, at this point, there are too many unanswered questions for the court to find that the balance of hardships tips in plaintiff's favor on this showing. The critical question is what level of consistency in scheduling of finger pricks and mealtimes is required. Will variations in eating schedules of more than twenty minutes, one hour, two hours be the key time at which "consistency" will be found lacking? The court is left to speculate on this issue. And, while defendants could have been more complete in their analysis of this critical question, especially given seemingly contradictory positions in the past, it is ultimately plaintiff's burden to persuade the court.

Moreover, not only for the layman, but even for physicians, it appears that the term "brittle diabetic" does not lend itself to a simple definition. For example, Dr. Wesley W. Wilson, retired from practicing Internal Medicine at Western Montana Clinic in Missoula, Montana, and himself diagnosed with Type I diabetes in 1956, has a web feature entitled "Ask the doctor," providing, in part, the following response to a question as to what brittle diabetes is:

> Brittle diabetes is hard to define. Often physicians label a person as a "brittle diabetic" when attempts to achieve control of the blood sugar result in wildly fluctuating blood sugar levels. Persons who have such unstable blood sugar levels almost always have Type I diabetes, are often slender (and very likely to have variable activity), and of course, are more likely to have a variable diet—items that lead to fluctuations in blood sugar levels.
>
> Some authorities state that if everyone with diabetes practiced good, tight control, no one would be "brittle," and they are partly right; many people's symptoms would be improved by tighter control. Sometimes, despite our best efforts, we are unable to reduce the blood sugar variations—some folks do everything right and still experience wild, out-of-proportion swoops and rises in their blood sugars— and these are truly "brittle." Luckily there are not many.

It is unclear to the court why plaintiff, an apparent brittle diabetic, whatever that might mean in plaintiff's case, was excepted from the current meal movement policy for three years. Was his

\\\\\

having been allowed the early release at first believed to be a medical necessity for his condition that, upon further medical evaluation, was determined not to be so?

Plaintiff has raised serious questions about a violation of his Eighth Amendment rights. Also, *if* plaintiff is correct on the merits, he might well suffer irreparable harm. In the final analysis, the outcome of plaintiff's motion depends on the balance of hardships. Because plaintiff's case is speculative at this point, the court cannot find that the balance of hardships tips his way. On the other hand, what the court finds not speculative are the security concerns expressed by defendants. Running a prison medical facility is a gargantuan task with its ceaseless balancing of security, medical, housing and staff needs. Uniformity in treatment is key to maintaining the institution afloat, and individualized programming has to be the rare exception taken only for extraordinary need. In addition, although plaintiff maintains that he seeks an exception to the existing policy only for himself, the realities of prison administration are such that a single exception is more likely than not to lead to a call for an across-the-board change in policy, at least as regards any inmates with a similar diabetic condition, a significant burden to defendants. The court must, on this showing, recommend a denial of plaintiff's motion for preliminary injunctive relief. Nonetheless, the court has determined that this case may be appropriate for appointment of counsel.

The United States Supreme Court has ruled that district courts lack authority to require counsel to represent indigent prisoners in § 1983 cases. Mallard v. United States Dist. Court, 490 U.S. 296, (1989). In certain exceptional circumstances, however, the court may request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1). Terrell v. Brewer, 935 F.2d 1015 (9th Cir. 1990); Wood v. Housewright, 900 F.2d 1332 (9th Cir. 1990). In this case the court is not sure whether those exceptional circumstances exist or not. Therefore, this court will refer this case to the civil rights panel in this district for review.

Plaintiff is cautioned while the case is under review, he has responsibility to continue to prosecute his action. The court is not staying the litigation pending the review; rather

the review and continued processing of this case will take place at the same time. No scheduled dates in this litigation have been vacated. Also, it may ultimately turn out that volunteer counsel may not be procurable for plaintiff's case.

Accordingly, IT IS HEREBY ORDERED that:

1. Counsel is directed to contact the Clerk's Office to make arrangements for copies of the file; and

2. The Civil Rights Clinic shall inform the court of their decision within thirty days.

IT IS HEREBY RECOMMENDED that plaintiff's March 3, 2005 motion for a preliminary injunction be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   1/5/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
stri1530.pi