1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10  GUY T. STRINGHAM,

11              Plaintiff,              No. CIV S- 04-1530 DFL GGH P

12      vs.

13  R. LEE, et al.,                    ORDER &

14              Defendants.            FINDINGS AND RECOMMENDATIONS

15  _____/

16  Introduction

17              Plaintiff, a state prisoner proceeding pro se,[1] seeks relief pursuant to 42 U.S.C. §

18  1983.  Pending before the court are 1) defendants' motion for summary judgment,[2] filed on April

19  _____

20          [1] In an Order, initially filed on January 5, 2006, which was renewed by Order, filed on
    September 20, 2006, due to defective service of the initial order, plaintiff's case was referred to
21  the King Hall Civil Rights Clinic for review to determine whether volunteer counsel could be
    procured for plaintiff; by letter dated November 13, 2006, Carter White, Supervising Attorney for
22  the clinic, informed the court that it was unable to take on the case in light of its already full
    docket.  Therefore, plaintiff still proceeds pro se in this matter.

23          [2] Because defendants had submitted a supporting declaration from a Captain Kaplan
    which was defective because it had not been signed under penalty of perjury, the court, by Order,
24  filed on January 25, 2007, ordered defendants to file the Kaplan declaration with a signature
    under penalty of perjury, within five days, or the motion would be vacated.  Defendants timely
25  filed the Kaplan declaration now sworn under oath, along with a re-submitted declaration by Dr.
    Joseph Bick, also now signed under penalty of perjury.  As to Dr. Bick's declaration, it has
26  apparently been modified to eliminate paragraphs 3-6 from the earlier declaration.  Therefore,

1

1  21, 2006, to which plaintiff filed his opposition on May 12, 2006; 2) plaintiff's (cross) motion for

2  summary judgment, filed on June 9, 2006; and 3) defendants' July 12, 2006, motion to strike

3  plaintiff's (cross) motion for summary judgment, to which plaintiff filed his opposition on July

4  21, 2006.  At the outset, the court notes that defendants have not brought their motion on behalf

5  of the entity defendants, CDC (now CDCR) and CMF-Vacaville, against whom plaintiff

6  proceeds on prospective injunctive relief claims made pursuant to the Americans With

7  Disabilities Act (ADA).  Therefore, those claims cannot be herein addressed and, in addition to

8  any remaining individual defendants, the matter will proceed as to those claims.[3]

9  Plaintiff's Cross Motion for Summary Judgment & Defendants' Motion to Strike

10          As to plaintiff's cross motion for summary judgment, the sole basis of the motion

11  is without merit and defendants' motion to strike it should be granted on that ground.  Plaintiff

12  maintains that he brings the motion pursuant to Fed. R. Civ. P. 56(a), such that no supporting

13  affidavits, statement of undisputed facts, etc., need be included.  However, the motion is

14  fundamentally flawed because plaintiff seeks summary judgment in his favor solely on the

15  ground that plaintiff was not provided with a copy of his complete deposition transcript, which

16  was lodged with the court, and portions of which were used to support defendants' motion for

17  summary judgment.

18          Plaintiff misconstrues the Local Rules when he asserts that they require he be

19  provided with a complete copy of his deposition transcript at defendants' cost.  As defendants

20  assert, the Local Rules require, in relevant part, that the *court* be provided with a hard copy of the

---

22  any undisputed facts by defendants which rely on any of these paragraphs must be supported by
    other documentation in the record or will be disregarded.

23      [3] Although this court noted that plaintiff had not shown a likelihood of success on the
24  merits on his ADA claim, in adjudicating his motion for a preliminary injunction, this does not
    mean that defendants are free to disregard the ADA claims altogether.  See Findings and
    Recommendations, filed on January 5, 2006, pp. 12-13, adopted by Order, filed on March 29,
25  2006.  Plaintiff may be able to demonstrate that defendants have denied him a "reasonable
    accommodation" under the ADA either by enforcing a policy which restricts diabetic inmates
26  from early release to the clinic or by failing to exempt plaintiff from the policy.

1   deposition transcript.  E. D. Local Rule 5-133(j).  While "[p]ertinent portions of the deposition

2   intended to become part of the official record shall be submitted as exhibits in support of a

3   motion or otherwise," id., plaintiff does not complain that he has not received any exhibit of

4   defendants which excerpts portions of the transcript of plaintiff's deposition relied on by

5   defendants' in support of their motion.  This is all that defendants are responsible for providing

6   him.  Nor does plaintiff challenge the accuracy of the transcribed portions of the deposition

7   submitted.[4]  Defendants' motion to strike plaintiff's (cross) motion for summary judgment will

8   be granted.

9   <u>Complaint</u>

10         The court herein reproduces the allegations of plaintiff's complaint as summarized

11   by the undersigned in a prior <u>Order</u> and <u>Findings and Recommendations</u>,[5] filed on January 5,

12   2006, at pages 1-4; and again in an <u>Order</u>, filed on September 20, 2006, at pages 2-3.

13
14
15
16

       Plaintiff names as defendants in this action, pursuant to 42 U.S.C.
       § 1983, R. Lee, J. Herrera, K. Providence, W. Fisher, G. Thumser,
       W. Bradanick, K. Allen, N. Grannis, S. O'Ran, and T. Schwartz.
       He also names as defendants, pursuant to Title II of the Americans
       with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., the
       California Department of Corrections (CDC)[6] and the California
       Medical Facility - Vacaville (CMF-Vacaville).

17
18
19

       Plaintiff, a Type I insulin dependent diabetic, alleges that defendant
       CMF Correctional Officer (C/O) Lee, on August 16, 2003, twice
       refused him medical care while he was experiencing a serious
       insulin reaction and even after plaintiff had called "Man Down,"

20         [4] As a separate ground for striking plaintiff's cross motion, defendants are also correct

21   that plaintiff has failed to comply with E.D. Local Rule 56-260(a), in failing to file with his
  motion a "Statement of Undisputed Facts."  Plaintiff's argument that he has filed his motion

22   pursuant to Fed. R. Civ. P. 56(a) does not permit him to disregard the Local Rules in filing his
  motion.  Plaintiff is also incorrect that the court's order, filed May 4, 2006, vacating the pretrial

23   conference and trial dates, pending adjudication of defendants' timely filed motion for summary
  judgment had the effect as well of vacating the dispositive motion filing date set by the

24   scheduling order, filed on November 18, 2005.

25         [5] The <u>Findings and Recommendations</u> were adopted by <u>Order</u>, filed on March 29, 2005,
  wherein plaintiff's motion for a preliminary injunction was denied.

26         [6] Now CDCR.

used only during medical emergencies.  Defendant Lee violated a state regulation prohibiting non-medical personnel from diagnosing or prescribing health care treatment for prisoners, CAL. CODE REGS. tit.xv, § 3354,[7] as well as plaintiff's constitutional rights under the Eighth and Fourteenth Amendments and his rights under the ADA. Complaint, pp. 2-4.

In addition to ignoring plaintiff's urgent requests for help, defendant Lee maliciously issued a CDC-115 Rules Violation Report (RVR) for "manipulation of staff" of which plaintiff was eventually found not guilty.  Medical Technical Assistant (MTA) St. John (not a defendant) tested plaintiff when he finally got to the clinic at 1735 hours on 8/16/03, finding that plaintiff's blood sugar level was 52 and therefore, low, as normal blood sugar level range is 70 to 120.   Upon retesting plaintiff at 1755 hours, after the MTA had sent him to eat, he found that plaintiff still tested low at 71, and found that plaintiff was having a "reaction."  Complaint, p, 3, Exhibit 1-A.  Once plaintiff began experiencing the insulin reaction, he required immediate caloric intake, and defendant Lee provided plaintiff no assistance.  Complaint, pp, 3-4.

Defendants J. Herrera, S. O'Ran, G. Thumser, T. Schwartz, K. Allen, and N. Grannis all denied plaintiff's appeals, relating to defendant Lee's conduct and the resulting RVR, through the Director's Level.  Complaint, p. 4.  Lee's acts were apparently justified because he was following orders of defendant K. Providence, CMF Correctional Lieutenant, who was in turn acting on orders of defendant W. Fisher, another Corr. Lt. assigned as third watch commander on 8/16/03.  These orders were based on an institutional memorandum authored by defendant W. Bradanick on March 16, 2000, which had not been applied to plaintiff previously due to his individually medically necessary treatments. Complaint, p. 5; Exhs. 4-6, 8.  Plaintiff had been granted "preferential movement," i.e., his treatment was contrary to, or an exception to, the Bradanick memo, which exception had been renewed repeatedly through August 19, 2003, and, thus, was still in effect at the time of plaintiff's 8/16/03 insulin reaction and defendant Lee's misconduct.  Id., pp. 5-6, Exhs. 4-6, 9.  The Bradanick memo, dated 3/16/2000, restricts inmate movement, including those inmates going to the B-1 Clinic for finger sticks, by having them released "**only** when their respective wing is released for the morning or evening meals,"[8] apparently for the purpose of

---

[7] "Authorized staff. Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their licensure, to diagnose illness or, prescribe medication and health care treatment for inmates.  No other personnel or inmates may do so." CAL. CODE REGS. tit.xv, § 3354(a).

[8] Emphasis in original.

ameliorating "mass movement and security problems with inmates inside of and outside of the B-1 Clinic area." Exh. 8 to complaint. Notwithstanding the memo, on September 1, 2000, plaintiff was found by the Chief Medical Officer Andreasen (not a defendant) to meet the requirements to be released as a brittle diabetic for fasting blood sugar tests. Complaint, p. 14, Exh. 5. Plaintiff's medical chrono, CDC 128-C, signed by non-defendants, Dr. Mark Altcher and Dr. Joseph Bick, Chief Medical Officer (CMO), was dated August 20, 2002, and was to remain in effect for one year, until August 19, 2003, and stated in relevant part: "Due to diabetes, he [plaintiff], needs to get to B-1 Clinic at 0630 and 1715 hours for fingersticks and insulin treatments, and should go the dining hall immediately thereafter." Exh. 4 to complaint.

Plaintiff is a Type I brittle diabetic, a condition recognized as a disability under the ADA. Compl., pp. 11-13. Defendant Fisher stopped the brittle diabetic release program in early 2003, focusing in a discriminatory manner only on diabetics. Id., p. 15. Evidence that defendant Fisher prevailed upon CMO Bick to exclude the release times is apparent in plaintiff's CDC-128 chrono, dated August 3, 2003, to remain in effect until August 4, 2004, wherein plaintiff's Type 1 brittle diabetic condition and requirements are set forth but no release times for fasting blood sugar tests are identified, although such times had been specified in the four preceding years. Id. Plaintiff asks that the CMF reinstate the brittle diabetic release program, seeking only prospective injunctive relief from the entity defendants, CDC and CMF-Vacaville, including renewal of his CDC-128-C medical chronos on a yearly basis, to be released for timely medical testing and treatment and assurances that staff will respond appropriately to plaintiff's emergency medical calls. He seeks money damages, including punitive damages, from the individual defendants.

Motion for Summary Judgment

Defendants move for summary judgment on the ground that 1) plaintiff was not deprived of treatment for his diabetic condition and did not suffer injury; 2) defendants had no knowledge or awareness of harm; 3) the undisputed facts demonstrate that defendants did not violate any constitutional right of plaintiff's; and 4) defendants are entitled to qualified immunity. Motion for Summary Judgment (MSJ), pp. 1-2.

*Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met. "The judgment sought shall be rendered forthwith if . . .

1   there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment

2   as a matter of law." Fed. R. Civ. P. 56(c).

3
>       Under summary judgment practice, the moving party
>       always bears the initial responsibility of informing the district court
4
>       of the basis for its motion, and identifying those portions of "the
>       pleadings, depositions, answers to interrogatories, and admissions
5
>       on file, together with the affidavits, if any," which it believes
>       demonstrate the absence of a genuine issue of material fact.

6

7   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

8   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

9   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

10  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

11  after adequate time for discovery and upon motion, against a party who fails to make a showing

12  sufficient to establish the existence of an element essential to that party's case, and on which that

13  party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

14  failure of proof concerning an essential element of the nonmoving party's case necessarily

15  renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

16  granted, "so long as whatever is before the district court demonstrates that the standard for entry

17  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

18          If the moving party meets its initial responsibility, the burden then shifts to the

19  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

20  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

21  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

22  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

23  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

24  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

25  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

26  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

1   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

2   Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

3   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

4   nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

5           In the endeavor to establish the existence of a factual dispute, the opposing party

6   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

7   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

8   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

9   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

10  genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

11  56(e) advisory committee's note on 1963 amendments).

12          In resolving the summary judgment motion, the court examines the pleadings,

13  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

14  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

15  477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

16  placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

17  at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

18  opposing party's obligation to produce a factual predicate from which the inference may be

19  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

20  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

21  party "must do more than simply show that there is some metaphysical doubt as to the material

22  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

23  nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct.

24  1356 (citation omitted).

25          On December 23, 2004, the court advised plaintiff of the requirements for

26  opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

1   Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and

2   Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

3                           *Legal Standard for Eighth Amendment Claim*

4              In order to state a § 1983 claim for violation of the Eighth Amendment based on

5   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

6   deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

7   285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

8   serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

9   501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

10  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

11  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

12             A serious medical need exists if the failure to treat a prisoner's condition could

13  result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

14  that a prisoner has a serious need for medical treatment are the following:  the existence of an

15  injury that a reasonable doctor or patient would find important and worthy of comment or

16  treatment; the presence of a medical condition that significantly affects an individual's daily

17  activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

18  F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

19  (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

20  grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

21             In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

22  defined a very strict standard which a plaintiff must meet in order to establish "deliberate

23  indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

24  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

25  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

26  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

1    should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

2        It is nothing less than recklessness in the criminal sense—a subjective standard—

3    disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

4    1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

5    that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

6    114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

7    of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

8    847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

9    knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

10   obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

11   1981.  However, obviousness per se will not impart knowledge as a matter of law.

12       Also significant to the analysis is the well established principle that mere

13   differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

14   Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

15   662 F.2d 1337, 1344 (9th Cir. 1981).

16       Moreover, a physician need not fail to treat an inmate altogether in order to violate

17   that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

18   1989).  A failure to competently treat a serious medical condition, even if some treatment is

19   prescribed, may constitute deliberate indifference in a particular case.  Id.

20       Additionally, mere delay in medical treatment without more is insufficient to state

21   a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766

22   F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is

23   no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing

24   Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

25   1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends

26   to provide additional support for a claim of deliberate indifference; however, it does not end the

9

inquiry.  <u>McGuckin</u>, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant."  <u>McGuckin</u>, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference.  <u>Hutchinson v. United States</u>, 838 F.2d 390 (9th Cir. 1988).  Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of fact, summary judgment should be entered for defendants.  The dispositive question on this summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

### *Undisputed Facts*

Some of defendants' undisputed facts are expressly not disputed by plaintiff.  The vast majority of those that are putatively disputed are ineffectually disputed because plaintiff operates under the incorrect belief that he was entitled to be provided with a complete copy of a transcript of his deposition testimony at their cost prior to defendants having filed their dispositive motion.  Because plaintiff tries to dispute a number of defendants' undisputed facts simply on the ground that the deposition transcript portions cited in their exhibit in support of any given fact was "illegally submitted,"[9] and not on any substantive basis or on the ground that the testimony therein was inaccurately transcribed, plaintiff is deemed not to have effectually

---

[9] Plaintiff makes no representation that he was not provided with the portions of his deposition testimony transcript on which defendants rely in support of their motion and undisputed facts.

1   disputed any such fact and each such fact is herein deemed undisputed, at least to the extent that

2   the testimony cited supports the fact defendants state is undisputed.  If defendants overreach as to

3   what the cited testimony supports, it will be noted in a modification of that fact set forth by the

4   court.

5            In addition, where plaintiff purports to dispute a fact simply on the basis of a lack

6   of first hand knowledge of a fact attested to under penalty of perjury by a defendant or a non-

7   party on behalf of defendants, plaintiff has not disputed that fact because his ignorance of a fact

8   will not be deemed to provide any factual basis for a dispute.  For example, as to defendants'

9   Undisputed Fact (DUF) No. 2, defendants cite a declaration by non-defendant Custody Captain

10   Kaplan they originally provided on July 14, 2005, in support of their opposition to plaintiff's

11   earlier motion for a preliminary injunction, which has now been modified to set forth, under

12   penalty of perjury, that the number of diabetic inmates who need finger-stick tests at CMF are

13   between 140 and 150.  Plaintiff purports to dispute this fact on the ground that he has "no first

14   hand knowledge of the actual number of prisoners" at CMF who need such tests, and on the basis

15   that, in his opinion, defendants have "been anything but forthright" in this action.  Opposition

16   (Opp.), pp. 3-4.  Defendants having met their initial responsibility in establishing the

17   approximate number of diabetics requiring finger-stick tests at CMF and thus having shifted the

18   burden to plaintiff to dispute it, plaintiff does not meet that burden to establish that a genuine

19   issue as to the material fact of how many such individuals there are based solely on his expressed

20   ignorance of the number or on his unsupported opinion that defendants are generally not

21   forthcoming.  See Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

22   supra, 475 U.S. at 586, 106 S. Ct. at 1356 n. 11.  Therefore, DUF No. 2 remains undisputed.

23            Finally, as noted in footnote 2 above, defendants, in submitting a modified, sworn

24   declaration for their medical expert have deleted paragraphs 3 through 6 of Dr. Bick's original

25   unsworn declaration.  These deletions are made without explanation and without authorization by

26   the court.  To the extent that defendants have relied on these paragraphs solely to support an

1   undisputed fact, that fact will be deemed to be disputed; if a fact is claimed to be undisputed and

2   partially rests on the deleted paragraphs, that portion of the issue supported solely by a deleted

3   paragraph only, if any, will be disregarded and that portion will not be found to be undisputed.

4          In light of the above the court will set forth those facts that are undisputed with

5   respect to the defendant to whom any such fact is relevant or applicable.

6              *Defendant Bradanick*

7          It is undisputed that on August 16, 2003, plaintiff was incarcerated at the

8   California Medical Facility in Vacaville (CMF) and that CMF currently houses 140 to 150

9   diabetic inmates who need finger-stick tests prior to eating.  DUF Nos. 1-2.  Exh. 2, Declaration

10  of Custody Captain Kaplan (hereafter Kaplan Dec.), ¶ 2; Declaration of Chief Medical Officer

11  (CMO) Dr. Joseph Bick at ¶ 2.[10]

12         Defendants argue that, while in the past CMF allowed diabetics early release to go

13  to the clinic before meals, this release policy led to problems, such as diabetic inmates mingling

14  with other inmates in other units, and, more troubling, diabetic inmates who were distributing

15  their insulin needles to other inmates for illegal drug use.   DUF No. 3, Kaplan Dec., ¶ 3.

16  Plaintiff takes issue with this representation, stating that defendants have produced no

17  documentation that substantiates the claim that diabetic inmates distributed insulin needles for

18  illegal drug use.  Opposition (Opp.), p. 4.  Plaintiff's argument is apparently that although Kaplan

19  has signed his declaration under penalty of perjury (as plaintiff has his opposition), he does not

20  provide the basis for his claim of the improper needle use, such as that he personally observed it,

21  or that plaintiff ever engaged in such conduct; nor does he cite any specific reports of such abuse,

22  and, as such this "fact" remains disputed.  However, it is not defendants' burden to provide

23  specific evidence that improper needle exchange actually occurred; given that prison safety and

24  security will always arguably be at issue if inmate movement is unregulated, it is enough that the

25

26         [10] Neither Capt. Kaplan or Dr. Bick are defendants in this action.

1  policy was designed to obviate the potential abuse.  Assuming that the policy infringes on a

2  constitutional right of plaintiff's, defendants have adequately met their burden to show that the

3  policy is reasonably related to a legitimate penological purpose.  Turner v. Safley, 482 U.S. 78,

4  89, 107 S. Ct. 2254, 2261 (1987) ("when a prison regulation impinges on inmates' constitutional

5  rights, the regulation is valid if it is reasonably related to legitimate penological interests.")[11]

6  Rather, in order to dispute defendants' concern raised on this point, it is plaintiff's burden to

7  show that no such improper needle use ever occurred under the old regimen, which he has not

8  done.

9         Defendant Bradanick's 3/16/00 memo, entitled "Inmate Movement for Medical

10 Purposes" states:

11         Inmate movement to B-1 Clinic for medical treatment (finger
          sticks, bandage changes, etc.) commencing immediately after the
12        clearing of the 0500 hour and 1645 hour Institutional Counts have
          created mass movement and security problems with inmates inside
13        and outside of the B-1 Clinic area.  With a concerted effort by Dr.
          Andreasen, Chief Medical Officer, Mr. Jovero, Food Services
14        Manager, and representatives of Central Services, a plan of action
          has been agreed upon.

15
          Effective immediately, all inmates will be released **only** when their
16        respective wing is released for the morning or evening meals.  The
          average time for conducting the meal release is 2 hours, and allows
17        sufficient time for inmates to receive treatment either prior to or
          after eating.
18
          There are approximately 50 inmates with Diabetes who require a
19        finger stick prior to eating.  Dr. Andresen [sic] voiced a concern
          that those inmates might miss their meal if not released prior to
20        their wings [sic] release.  The solution to this concern is that the
          S&E calling the meal will first notify B-1 Clinic to ensure there are
21        no inmates still receiving finger sticks before concluding the meal.

22

23         [11] "A second consideration is whether alternative means of exercising the right on which
      the regulation impinges remains open to prison inmates.  A third consideration is the impact
24    accommodation of the asserted right will have on guards, other inmates, and the allocation of
      prison resources.  Finally, the absence of ready alternatives is evidence of the reasonableness of a
25    prison regulation."  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, supra,
      482 U.S. at 89-91, 107 S. Ct. 2254).   None of these factors appear to weigh in plaintiff's favor
26    with respect to controlling the movement of a group of inmates that now number up to 150, in
      assessing the reasonableness of the policy.

1    A list of the inmates requiring finger sticks before eating will be on
    file in B-1 Clinic.

2    ....................................................................................................

3 Exh. 8 to Complaint [emphasis in orginal.]

4    Defendants maintain that CMF's diabetic policy has continued to evolve since the

5 issuance of defendant Bradanick's 3/16/00 memo.  Currently, diabetic inmates are released to the

6 clinic at meal times only as advocated in the Bradanick memo and early release finger-sticks are

7 not allowed.  Defendants believe that releasing diabetics at other times "would create movement

8 and security problems."  DUF No. 4, Kaplan Dec., ¶ 4.  Defendants, however, do not explain

9 why, once the Bradanick memo was issued, an exception for brittle diabetics was made, at least

10 until 2003, and at least as to this plaintiff.   Plaintiff does not so much dispute that movement and

11 security issues could arise should diabetics be released at other than meal times but contends that

12 it is only his being released early, one inmate, that is at issue and that his being allowed to leave

13 early could not create a safety and security issue.  Opp., p. 4.  Therefore, it appears that plaintiff

14 does not challenge the policy on its face, but rather as it is applied to him individually.

15    Defendants set forth as an undisputed fact that defendant Bradanick's involvement

16 in this matter is limited to the drafting of the 3/16/2000 memorandum, which pertains to

17 controlling inmate movement for medical purposes; therefore, this fact is undisputed.  DUF No.

18 5, Exh. 1, plaintiff's dep., 35:25, 36: 1-2, 6-8.  Plaintiff does not appropriately dispute this point,

19 but the portion of plaintiff's deposition not cited in the excerpt relied on above by defendants,

20 Exh 1, 36:2-5, makes clear that plaintiff states that the Bradanick policy is currently in use

21 preventing plaintiff's early release for any testing, prior to meal time.  Defendants maintain that

22 defendant Bradanick did not have any knowledge of plaintiff's medical condition, a fact that

23 remains effectively undisputed.  DUF No. 6, citing Exh. 1, plaintiff's dep., 36:6-14.  Also

24 undisputed is the fact that plaintiff became aware of the policy change controlling the movement

25 of diabetic inmates in May or June of 2003.  Exh. 1, plaintiff's dep., 31:15-19.

26 \\\\\

1          In their argument that defendant Bradanick is entitled to summary judgment,

2  defendants point out that his involvement is undisputedly limited to the drafting of the

3  memorandum advocating a policy for inmate movement for medical reasons (set forth above),

4  three years before its implementation.   MSJ, p. 8.  It is also undisputed that defendant Bradanick

5  did not have any awareness of plaintiff's particular medical needs and conditions.   Although

6  plaintiff protests the implementation of the policy fashioned by this defendant, he explicitly, as

7  noted above, does not do so on its face; rather, he challenges only its application to himself.  As

8  defendants note, nothing on the face of the policy suggests that this defendant could not have

9  reasonably believed that its implementation was other than lawful.  Id.  The policy was designed

10  to address security and safety problems while permitting access to treatment by diabetic inmates

11  by limiting releases to mealtimes.  Id.  Plaintiff having failed to demonstrate by way of expert

12  testimony that the diabetic inmate release policy implemented (or re-implemented) in 2003

13  violates the constitutional right of diabetics to adequate medical care for a serious medical

14  condition, the court finds that defendants' motion as to defendant Bradanick should be granted.

15                  *Defendants Fisher and Providence*

16          Defendants set forth as an undisputed fact that defendant Fisher's involvement in

17  this case arises from his being the watch commander who followed the directive of a correctional

18  captain to comply with defendant Bradanick's memorandum on releases and inmate movement,

19  which limited diabetic inmate releases to the clinic for finger-stick tests to the mealtime release,

20  due to security and inmate movement concerns.  DUF No. 8, Exh. 3, defendant Fisher's response

21  to plaintiff's interrogatories, 3:19-22; MSJ, p. 4.

22          As to defendant Providence, defendants state that it is undisputed that this

23  defendant's involvement in this matter is in the capacity of Unit 1, program lieutenant, and

24  limited to implementation of the same policy wherein diabetics were not to be released for

25  finger-stick tests until their units were released for mealtimes, regardless of whether an inmate

26  has a medical chrono which authorized another release time.  DUF No. 9, defendant Providence's

1   interrogatory response, 3:18-21.  Plaintiff does not specifically dispute these facts; rather, he

2   simply argues that the policy violated his rights under the ADA, and the Eighth and Fourteenth

3   Amendments.[12]  As to plaintiff's contention that the diabetic mealtime release program violates

4   the provisions of the ADA, such an argument is not apposite in the context of the pending motion

5   for summary judgment, wherein defendants have only moved for summary judgment against

6   plaintiff on his Eighth Amendment claims against the individual defendants.  Whether or not the

7   policy violates plaintiff's Eighth Amendment rights is a separate question from whether or not

8   there is a dispute as to the facts with respect to defendants Fisher and Providence's involvement

9   in this case.  It is evident that they are not.

10                  Plaintiff contends that the restricted inmate release policy, re-implemented by

11   defendants Fisher and Providence, is unconstitutional because it instructs custody staff to ignore

12   valid medical orders/prescriptions written on CDC-128-C medical chronos by doctors and

13   endorsed by the Chief Medical Officer (CMO), depriving an inmate, specifically himself, of the

14   medical care that his condition requires on a consistent and timely basis.  Opp., p. 17.  As

15   plaintiff has alleged, notwithstanding the Bradanick memo, on September 1, 2000, plaintiff was

16   found by Chief Medical Officer Andreasen (not a defendant) to meet the requirements to be

17   released as a brittle diabetic for fasting blood sugar tests.  Complaint, p. 14, Exh. 5.  Plaintiff's

18   medical chrono, CDC 128-C, signed by non-defendants, Dr. Mark Altcher and Dr. Joseph Bick,

19   Chief Medical Officer (CMO), was dated August 20, 2002, and was to remain in effect for one

20   year, until August 19, 2003, stating in relevant part: "Due to diabetes, he [plaintiff], needs to get

21   to B-1 Clinic at 0630 and 1715 hours for fingersticks and insulin treatments, and should go to

22   dining hall immediately thereafter."  Exh. 4 to Compl.  Plaintiff relies on a series of medical

23   chronos to demonstrate that he had been exempted from the limited release policy; particularly as

24   _____

25          [12] Plaintiff never sets forth how the policy implicates the Fourteenth Amendment (e.g.,
    due process or equal protection) rights; rather, he apparently references the Fourteenth
    Amendment because it is by way of this amendment that, inter alia, the Eighth Amendment is
26   applicable to the  states.  Opp., p. 17.

to defendant Fisher, plaintiff contends that on August 16, 2003, his medical chrono, effective until August 19, 2003, should have permitted him early release for testing. See, plaintiff's reply to earlier motion for preliminary injunction, p. 3; plaintiff's dec., p. 4; Exhs. 4, 6, 9 to complaint. Each of these medical chronos asserts that plaintiff needs to get to B-1 Clinic at 0630 [6:30 a.m.] and 1715 [5:15 p.m.] hours for fingersticks and insulin treatments, and should, immediately thereafter go to dining hall. Id. CMO Dr. Andreasen stated in the 2001 to 2002 chrono, dated 11/29/01, that "[t]his is for optimal glucose control and to prevent dangerously high or low blood sugars." Exh. 5 to complaint. In the 1999 to 2000 chrono, dated 12/29/99, non-defendants Drs. Anderson and Andreasen made or endorsed a similar medical assessment.

However, plaintiff's own allegations make clear his belief that defendant Fisher prevailed upon non-defendant CMO Bick to exclude the release times in plaintiff's CDC-128 chrono, dated August 3, 2003, to remain in effect until August 4, 2004, wherein plaintiff's Type 1 brittle diabetic condition and requirements are set forth but no release times for fasting blood sugar tests are identified, although such times had been specified in the four preceding years. Compl., p. 15. Thus, that defendant Fisher had counseled staff to disregard medical chronos to the contrary at the time of the incident at issue herein, August 16, 2003, the fact that the Chief Medical Officer has since that time not believed that plaintiff's medical condition warranted early release outside the parameters of the current policy weighs against a finding that defendants Fisher or Providence, in implementing the limited release policy could have violated plaintiff's constitutional right to adequate medical care. The court finds that defendants' motion for summary judgment as to defendants Fisher and Providence should be granted.

### *Defendant Lee*

There is no dispute as to most of the following facts (either because plaintiff expressly does not dispute the fact or because he attempts to dispute it only on the illegitimate ground that the fact is supported only by plaintiff's deposition testimony, which, as noted, he incorrectly believes has been "illegally submitted"); where plaintiff takes issue with a

representation of an undisputed fact, it is noted.  Defendant Lee was the correctional officer

assigned to plaintiff's unit on August 16, 2003.  DUF No. 10.  On 8/16/03 at 5:15 p.m., plaintiff

told defendant Lee that he needed to go to the clinic or to eat.  DUF No. 11, Exh. 1, plaintiff's

dep., 15:10-12.  Defendant Lee told plaintiff that he would be released for chow soon and that he

could go to the clinic at that time.  DUF No. 12, Exh. 1, 22:5-7.  Plaintiff, at 5:20 p.m., stood

against his cell door and made a "man down" call.  DUF No. 13, Exh. 1, 15:18-21, 16:16-17.

Defendant Lee responded to plaintiff's call.  DUF No. 14, Exh. 1, 16:16; 24:18-21.  Plaintiff has

admitted that he does not know what defendant Lee noticed or observed concerning plaintiff's

condition when defendant Lee responded to the call.  DUF No. 15, Exh. 1, 16:16-18, 26:15-16.

When defendant Lee responded to plaintiff's call, plaintiff told defendant Lee that he needed to

go to the clinic or eat.  DUF No. 16, Exh. 1: 25:4.  After speaking with plaintiff, defendant Lee

determined that plaintiff was not in distress.  DUF No. 17, Exh. 1, 16:18-20; Exh. 5, defendant

Lee's response to plaintiff's interrogatories, p. 6: 2.  Defendant Lee told plaintiff that he could go

to the clinic when he was released for chow.  DUF No. 18, defendant Lee's interrogatory

response, p. 3:27, p. 4: 1.  Plaintiff asserts expressly that as to this undisputed fact he does not

challenge that it occurred, but he posits that defendant Lee could not be sure as to exactly how

long it would be until meal release; thus, he argues, Lee's action in not allowing him out

immediately constituted deliberate indifference to plaintiff's medical distress.

Plaintiff was released from his cell along with other inmates in his wing for the

evening meal at 5:30 p.m.  DUF No. 19, Exh. 1, 16:22-23.  Plaintiff went to the clinic, received a

blood sugar test that showed a blood sugar level of 52, was told by a medical technical assistant

(MTA) to eat dinner then return for another test.  About 20 minutes later, plaintiff's blood sugar

was retested at 71.  DUF No. 20, Exh. 1, 17:19-22.  The court notes that in the unsworn

declaration by CMO Dr. Bick, this fact was also supported; however, the CMO in his sworn

declaration has eliminated references to the specifics of plaintiff's blood sugar levels during the

8/16/03 incident.

1    At DUF 21, defendants state that it is undisputed that plaintiff's blood sugar was

2 somewhat below normal, but not life-threatening, that normal blood sugar range is between 60

3 and 110, that plaintiff's blood sugar level at 71 was within normal limits, that plaintiff's blood

4 sugar level at 52 indicated low blood sugar, and that the treatment for this condition would be

5 that plaintiff should eat, which he did.  Defendants also assert that diabetic inmates at CMF are

6 provided with supplemental food or snacks to maintain their blood sugar levels between

7 mealtimes.  However, while in the unsworn declaration defendant's expert supported these

8 conclusions, he does not do so as explicitly in the sworn declaration.[13]  That is, he states more

9 broadly the following: "[t]here is no evidence in the plaintiff's medical files that he required any

10 further medical care on August 16, 2003.  Nor is there evidence that plaintiff suffered any

11 permanent injury from the incident.  In fact, any symptoms that may have been caused by a blood

12 sugar level of 52, such as faintness or anxiety, would have been resolved by eating."  Bick Dec.,

13 ¶ 7.

14    Thus it is that defendants' medical expert does not express a medical opinion as to

15 what the normal blood sugar levels are; nor does he declare that diabetic inmates are provided

16 with supplemental food or snacks to maintain their blood sugar levels between meals.  Plaintiff

17 refers to his affidavit in reply to defendants' opp. to his preliminary injunction (p.i.) motion,

18 wherein he had averred that he was provided only a bedtime snack to be eaten between the

19 evening and morning meals.  Opp., p. 18.  Plaintiff therein stated that a snack consists of one

20 slice of bread, two pieces of fruit and two thin slices of lunchmeat and a mustard packet, which

21 must provide the coverage for the 12 hours between dinner and breakfast, leaving nothing for the

22 time between meals during the day.  See, reply to opp. to p.i. motion, p. 6, plaintiff's affid., pp. 5-

23 6.  Plaintiff's description of his opinion of the limitations of the snack does not, however, refute

24

25  [13] Plaintiff's Exh. 2 to his complaint contains a copy of a medical log containing, inter alia, the two readings of blood glucose levels taken on 8/16/03: showing 52 and then 71 as entered in the log; thus, plaintiff's exhibit adequately supports that the two readings are an

26 undisputed fact.

1   the fact that he is provided with a supplemental snack.

2           Defendants maintain that there is no medical evidence demonstrating that plaintiff

3   required any further medical care or suffered permanent injury from the incident of August 16,

4   2003, and that plaintiff admits there is no evidence of physical or cognitive damage resulting

5   from the incident.  DUF Nos. 22-24, Exh. 1, 45:6-11; Bick Dec., ¶ 7.[14]  Plaintiff takes issue with

6   the representation that no evidence in his medical record shows that he suffered cognitive

7   impairment, pointing to earlier exhibits he has provided indicating that the severity of any

8   cognitive impairment is related to the severity of the insulin reaction.  Opp., p. 7.  Exhibit 12 to

9   plaintiff's inapposite response to defendants' answer consists of a lengthy scientific article[15]

10  which, in the court's review, does not appear to be particularly helpful to plaintiff.  As to Type 1

11  diabetics, the type of diabetes from which plaintiff suffers, there is apparently a more negative

12  cognitive impact on those patients who attempt to maintain "tight" metabolic control, that is,

13  those who try to keep their blood glucose levels as close to the normal range as possible "since

14  numerous studies have demonstrated that tight metabolic control is associated with a greatly

15  increased incidence of severe hypoglycemia...."  Exh. 12, p. 31 (p. 55 in electronic pagination).

16  As to the effects of "repeated episodes of moderately severe hypoglycemia," the author states that

17  they may result in "detectable changes in the information-processing efficiency of Type 1

18  diabetic adults."  Id., at 32 (p. 56).   Nevertheless, the article concludes that "moderate or severe

19  cognitive impairments are rarely found in diabetic individuals...." and that more intensive or

20  tighter control of insulin levels may have the effect of "an increased risk of developing subtle,

21  and perhaps not so subtle, cognitive impairment secondary to the hypoglycemia that often occurs

22   

23        [14] Defendants cited ¶ 8 of the unsworn Bick declaration; however, the findings relating to
    no evidence of plaintiff's need for further medical care or of having suffered permanent injury
24  are now supported by Dr. Bick in his modified sworn declaration at ¶ 7.

25        [15] "Effects of Diabetes Mellitus on Neuropsychological Functioning: A Lifespan
    Perspective," by Christopher M. Ryan, Dept. of Psychiatry, University of Pittsburgh School of
26  Medicine.

1  during intensive therapy." Id., at 37, (p. 71). The information provided by this article is not

2  particularly helpful to plaintiff both because the court has no way of determining its relevance to

3  plaintiff's particular medical condition and regimen and also because it appears to suggest that

4  diabetics generally do not show significant cognitive impairment from even repeated

5  hypoglycemic episodes. Plaintiff points to exhibits he submitted in reply to defendants'

6  opposition to his motion for a preliminary injunction. Exhs. 14A, 14B, 14C, and 15 are various

7  publications or excerpts of publications related to medical care for diabetics generally. However,

8  plaintiff produces no expert medical evidence to show that he in particular suffered cognitive

9  impairment from the episode at issue, or even was likely to have in such a situation.

10        Plaintiff argues that on August 16, 2003, he was out of food in his cell and was

11  having an insulin reaction, when defendant Lee, responding to plaintiff's call for help,

12  improperly made a medical determination in violation of a prison regulation, CAL. CODE REGS.

13  tit.xv, § 3354 (see footnote 6, supra), not permitting him having immediate medical attention at

14  the clinic or allowing him to obtain food immediately, exhibiting deliberate indifference to

15  plaintiff's serious medical condition. Opp., p. 22. Plaintiff's reference to defendant Lee's

16  putative violation of a state prison regulation is only relevant to the extent that any such violation

17  could be deemed to have risen to the level of a constitutional violation pursuant to the Eighth

18  Amendment, which plaintiff does not demonstrate.

19        Although plaintiff was undisputedly delayed from eating or going to the clinic for

20  a finger-stick test, from 5:15 p.m. until 5:30 p.m., when his unit was released for meals, plaintiff

21  provides no expert medical evidence to demonstrate that this fifteen-minute delay constituted

22  deliberate indifference on the part of defendant Lee. Defendant's medical expert, on the other

23  hand, submits sworn testimony to the effect that plaintiff's medical records do not show

24  permanent injury from the incident nor, further, that plaintiff will suffer from getting his finger-

25  stick test at some time after 6:30 a.m. and 5:15 p.m., stating "there is nothing magical about the

26  6:30 a.m. and 5:15 p.m. times mentioned in the plaintiff's requested medical chrono, as long as

1   plaintiff gets a finger-stick on a consistent basis every day and has enough time to eat

2   afterwards." Bick dec., ¶¶ 7-8. Plaintiff simply does not refute this finding by a medical expert

3   with expert medical testimony supporting his allegations. The court is not equipped to render

4   judgment in plaintiff's favor on such an issue given the state of the record. As noted, in a case

5   such as plaintiff's, expert opinion will almost always be necessary to establish the necessary level

6   of deliberate indifference. Hutchinson v. United States, supra, 838 F.2d 390. Without adequate

7   expert evidence, plaintiff is unable to establish that the treatment he received at the hands of

8   defendant Lee, or as a result of the application to plaintiff of the policy modified to limit diabetic

9   inmate releases to mealtimes, equated with deliberate indifference such that a material issue of

10  fact has been raised. Plaintiff is unable to demonstrate that defendant Lee's failure to allow

11  plaintiff immediate release to the clinic or to food access, on August 16, 2003, was criminally

12  reckless. Defendants' motion for summary judgment as to defendant Lee should be granted.

13              *Defendants O'Ran, Herrera, Thumser, Allen, Grannis, and Schwartz*

14              The following facts as to these defendants are undisputed: no medical evidence

15  demonstrates that plaintiff required any further medical care or suffered permanent injury from

16  the incident of August 16, 2003, and plaintiff admits there is no evidence of physical or cognitive

17  damage resulting from the incident. DUF Nos. 22-24, Exh. 1, 45:6-11; Bick Dec., ¶ 7.[16] Plaintiff

18  filed a grievance against defendant Lee for denying plaintiff's request to be allowed to go to the

19  clinic or to go eat on 8/16/03, which grievance was denied by defendant O'Ran, whose

20  involvement in this action is limited to his role in preparing the first level appeal response. DUF

21  Nos. 24-26, attachments 1A-1D, 2A-2B to compl.; Exh. 1, plaintiff's dep., 38:20-25.[17]

22  Defendant Schwartz's involvement in this case is limited to the processing of plaintiff's appeal

23

24       [16] Defendants cited ¶ 8 of the unsworn Bick declaration; however, this fact is supported
     by Dr. Bick in his modified sworn declaration at ¶ 7.

25       [17] Plaintiff goes on to say that he has no way of knowing what defendant O'Ran knew
     prior to his appeal reaching this defendant, but this is not sufficient to dispute the basis for
26   plaintiff's suing him here. Exh. 1, 39:8-18.

1  following the 8/16/03 incident.  Exh. 1, 39:19-25; (see also, 40:3-13).  Plaintiff's third level

2  appeal was reviewed by defendant Allen and signed by defendant Grannis; Allen's involvement

3  in this case is limited to his role as reviewer of plaintiff's third level appeal and Grannis'

4  involvement arises solely from her having denied plaintiff's third level appeal.  DUF Nos. 30-32,

5  compl., p. 4 & attachment 8, Exh. 1, 37:17-21(see also, 38:4-11).  Defendant Thumser's

6  involvement in this case arises from his interview of plaintiff, related to an investigation for the

7  processing of the appeal, and defendant Herrera's involvement arises only from the processing of

8  plaintiff's appeal concerning the 8/16/03 incident.  DUF Nos. 33-34, Exh. 1, 40:14-20; 41:4-15,

9  23-25; 42 1-9.

10         Plaintiff seeks to hold these defendants accountable on a sort of ratification

11  theory; that is, on the basis that these defendants have been deliberately indifferent to his medical

12  needs arising from his serious medical condition because they have denied his appeal of

13  defendant Lee's actions on 8/16/03.

14         Defendants sued in their individual capacity must be alleged to have: personally

15  participated in the alleged deprivation of constitutional rights; knew of the violations and failed

16  to act to prevent them; or implemented a policy that repudiates constitutional rights and was the

17  moving force behind the alleged violations.  Larez v. City of Los Angeles, 946 F.2d 630, 646

18  (9th Cir. 1991); Hansen v. Black, 885 F.2d 642 (9th Cir. 1989); Taylor v. List, 880 F.2d 1040 (9th

19  Cir. 1989).  "Although a § 1983 claim has been described as 'a species of tort liability,' Imbler v.

20  Pachtman, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L.Ed.2d 128, it is perfectly clear that not

21  every injury in which a state official has played some part is actionable under that statute."

22  Martinez v. State of California, 444 U.S. 277, 285, 100 S. Ct. 553, 559 (1980).  "Without

23  proximate cause, there is no § 1983 liability."  Van Ort v. Estate of Stanewich, 92 F.3d 831, 837

24  (9th Cir. 1996).

25         The search, which was performed in accordance with this constitutionally valid
           strip search policy, was subsequently ratified by the School Board when Mr.

26         Williams filed a grievance.  Therefore, Williams' only grasp at evoking municipal

1
2
3
4
5

> liability under § 1983 is to show that this subsequent ratification is sufficient to establish the necessary causation requirements.  Based on the facts, the Board believed Ellington and his colleagues were justified in conducting the search of Williams.  There was no history that the policy had been repeatedly or even sporadically misapplied by school board officials in the past.  Consequently, the School Board cannot be held liable for the ratification of the search in question, because this single, isolated decision can hardly constitute the "moving force" behind the alleged constitutional deprivation.

6  Williams v. Ellington, 936 F.2d 881, 884-885 (9th Cir. 1991).

7           This court is unwilling to adopt a rule that anyone involved in adjudicating

8  grievances after the fact is per se potentially liable under a ratification theory.  However, this is

9  not to say that persons involved in adjudicating administrative disputes, or persons to whom

10  complaints are sometimes made, can never be liable under a ratification theory.  If, for example,

11  a reviewing official's rejections of administrative grievances can be construed as an automatic

12  whitewash, which may have led other prison officials to have no concern of ever being

13  reprimanded, a ratifying official may be liable for having put a defective policy in place.

14           As to any claim of an Eighth Amendment violation, defendants correctly assert

15  that simply because plaintiff was unhappy with the outcome of the appeals, he has not thereby

16  established a causal connection between the incident of August 16, 2003, and any of the

17  defendants who were involved in the appeal process.  MSJ, pp. 7-8.  The undisputed facts do

18  demonstrate that none of these defendants, officials engaged in reviewing and investigating

19  plaintiff's claims related to the 8/16/03 incident, had any involvement in the incident itself or

20  were aware of plaintiff's medical condition at the time of the incident.  As significant, however,

21  is that since this court has not found that a genuine issue of material fact remains as to the

22  gravamen of plaintiff's allegations, which center on defendant Lee's response to plaintiff's calls

23  for assistance on 8/16/03, any response related to plaintiff's grievances concerning that incident

24  cannot implicate a constitutional right of plaintiff's.  Defendants motion for summary judgment

25  as to defendants O'Ran, Herrera, Thumser, Allen, Grannis, and Schwartz should be granted.

26  \\\\\

1    Accordingly, IT IS ORDERED that:

2    1.  This matter still proceeds as to plaintiff's claims under the ADA for

3    prospective injunctive relief claims against the entity defendants, CDCR and CMF;

4    2.  Defendants' July 12, 2006, motion to strike plaintiff's June 9, 2006, (cross)

5    motion for summary judgment is granted; and

6    3.  Plaintiff's June 9, 2006, defective (cross) motion for summary judgment is

7    stricken.

8    IT IS HEREBY RECOMMENDED that defendants' April 21, 2006, motion for

9    summary judgment be granted as to defendants Bradanick, Fisher, Providence, Lee, Herrera,

10   Grannis, Allen, Schwartz, O'Ran, and Thumser, and this matter proceeds only as to the ADA

11   claims against defendants CDCR and CMF.

12   These findings and recommendations are submitted to the United States District

13   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14   days after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.  Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17   shall be served and filed within ten days after service of the objections.  The parties are advised

18   that failure to file objections within the specified time may waive the right to appeal the District

19   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20   DATED: 2/20/07

21                                         /s/ Gregory G. Hollows

22                                         _____
                                          GREGORY G. HOLLOWS
                                          UNITED STATES MAGISTRATE JUDGE

23   GGH:009
     stri1530.msj

24

25

26