IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GUY T. STRINGHAM,

    Plaintiff,                      No. CIV S- 04-1530 JAM GGH P

    vs.

R. LEE, et al.,                        ORDER &amp;

    Defendants.              FINDINGS AND RECOMMENDATIONS

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se,[1] seeks relief pursuant to 42 U.S.C. § 1983. Pending before the court are 1) defendants' supplemental motion for summary judgment, filed on October 2, 2007, to which plaintiff filed his opposition on November 28, 2007, having been granted an extension of time by Order, filed on October 29, 2007; 2) plaintiff's cross-motion for summary judgment (denominated by plaintiff a "counter motion"), filed on January

---

[1] As has been previously noted in the Order/Findings and Recommendations, filed on 2/20/07, adjudicating the prior summary judgment motion (adopted on 3/30/07), in an Order, initially filed on January 5, 2006, which was renewed by Order, filed on September 20, 2006, due to defective service of the initial order, plaintiff's case was referred to the King Hall Civil Rights Clinic for review to determine whether volunteer counsel could be procured for plaintiff; by letter dated November 13, 2006, Carter White, Supervising Attorney for the clinic, informed the court that it was unable to take on the case in light of its already full docket. Therefore, plaintiff still proceeds pro se in this matter.

1

18, 2008; and 3) defendants' February 6, 2008, motion to strike plaintiff's cross-motion for summary judgment, to which plaintiff filed his opposition on February 20, 2008.

By Order, filed on March 20, 2007, defendants' motion for summary judgment was granted as to plaintiff's claims against the individual defendants. This matter proceeds now solely as to the prospective injunctive relief claims pursuant to Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., against the entity defendants California Department of Corrections and Rehabilitation (CDCR) and California Medical Facility-Vacaville (CMF). In the Findings and Recommendations, filed on February 20, 2007, n. 3, adopted by the Order, noted above, filed on March 20, 2007, the court observed that although plaintiff had not shown a likelihood of success on the merits on his ADA claim, in adjudicating his motion for a preliminary injunction, this did not mean that defendants were free to disregard the ADA claims altogether. See Findings and Recommendations, filed on January 5, 2006, pp. 12-13, adopted by Order, filed on March 29, 2006. Plaintiff was permitted to proceed on the ADA claims, which were unaddressed by the prior dispositive motion, because plaintiff might be able to demonstrate that defendants have denied him a "reasonable accommodation" under the ADA either by enforcing a policy which restricts diabetic inmates from early release to the clinic or by failing to exempt plaintiff from the policy.

Plaintiff's Cross-Motion for Summary Judgment & Defendants' Motion to Strike

As to plaintiff's cross-motion for summary judgment, the court agrees with defendants' contention that it was not properly filed. The court by Order, p. 4, filed on September 4, 2007, "reluctantly" granted defendants permission to bring a supplemental motion for summary judgment, "on the ground that the equitable relief claims may be barred by Armstrong." The court reached this conclusion after reviewing the pretrial statements of the parties even though in an Order, filed on April 30, 2007, the court had earlier denied defendants' request for a further dispositive pretrial motion. The undersigned noted in part in the Order, filed on September 4, 2007, p. 2, the following:

On 4/12/07, defendants sought leave to file a motion for summary judgment as to plaintiff's ADA claims for injunctive relief on the ground that counsel for defendants had mistakenly thought that denial of plaintiff's motion for preliminary injunctive relief disposed of all injunctive relief claims. Defendants provided no substantive basis for such a motion and plaintiff opposed it. In an Order, filed on 4/30/07, the court, inter alia, denied defendants' request on the ground that plaintiff would be unfairly prejudiced if a further dispositive pretrial motion were permitted simply based on a miscalculation or erroneous assessment by counsel for defendants as to whether the matter proceeded on plaintiff's claims for injunctive relief.

However, upon this court's review of the pretrial statements, defendants for the first time, albeit belatedly, provide a substantive legal basis for being permitted to proceed on a dispositive motion with regard to plaintiff's claims for equitable relief under the ADA. Defendants aver that plaintiff, a state prisoner, is barred from seeking injunctive relief under the ADA by the Armstrong consent decree, citing Crayton v. Terhune, No. 98-4386 2002 WL 310093590, at *4 (N.D. Cal. Sept. 17, 2002)(in turn, citing Armstrong v. Davis, et al., No. CV 94-2307 CW (N.D. Cal.)). Defendants' pretrial statement (DPT), p. 2. Defendants state further that "[t]o the extent that plaintiff must assert that he is an inmate with a disability, plaintiff is a member of the class under Armstrong v. Davis, et al., No. CV 94-2307 CW (N.D. Cal.), and cannot request prospective injunctive relief under the ADA because these issues are already subject to court enforcement through a class action." DPT, p. 9.

Defendants subsequently filed their supplemental motion for summary judgment within the time constraints set forth in the Sept. 4, 2007, Order. The court granted plaintiff's motion for an extension of time to file his opposition, as noted above. However, almost two months following the filing of his opposition, plaintiff then filed his would-be cross-motion. Thus, as defendants' aver, plaintiff filed his cross-motion beyond the extension of time granted plaintiff in the Order, granting him an extension of time, filed on October 29, 2007. Not only was the cross-motion filed beyond the liberal extension of time, until December 3, 2007, the court granted plaintiff for any response to the pending supplemental summary judgment motion, plaintiff failed to seek a further extension for making any filing beyond an opposition to the pending motion. The court will strike the cross-motion as untimely brought.

\\\\\

Complaint

Although summary judgment has been granted to all the individual defendants on plaintiff's claims for money damages, in order to provide context for the remaining ADA injunctive relief claims, the court herein reproduces the allegations of plaintiff's complaint as summarized previously by the undersigned. See, e.g., Order and Findings and Recommendations, filed on February 20, 2007, at pp. 3-5.[2]

> Plaintiff names as defendants in this action, pursuant to 42 U.S.C. § 1983, R. Lee, J. Herrera, K. Providence, W. Fisher, G. Thumser, W. Bradanick, K. Allen, N. Grannis, S. O'Ran, and T. Schwartz. He also names as defendants, pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., the California Department of Corrections (CDC)[3] and the California Medical Facility - Vacaville (CMF-Vacaville).
>
> Plaintiff, a Type I insulin dependent diabetic, alleges that defendant CMF Correctional Officer (C/O) Lee, on August 16, 2003, twice refused him medical care while he was experiencing a serious insulin reaction and even after plaintiff had called "Man Down," used only during medical emergencies. Defendant Lee violated a state regulation prohibiting non-medical personnel from diagnosing or prescribing health care treatment for prisoners, CAL. CODE REGS. tit.xv, § 3354,[4] as well as plaintiff's constitutional rights under the Eighth and Fourteenth Amendments and his rights under the ADA. Complaint, pp. 2-4.
>
> In addition to ignoring plaintiff's urgent requests for help, defendant Lee maliciously issued a CDC-115 Rules Violation Report (RVR) for "manipulation of staff" of which plaintiff was eventually found not guilty. Medical Technical Assistant (MTA) St. John (not a defendant) tested plaintiff when he finally got to the clinic at 1735 hours on 8/16/03, finding that plaintiff's blood sugar level was 52 and therefore, low, as normal blood sugar level range is 70 to 120. Upon retesting plaintiff at 1755 hours, after the MTA had sent him to eat, he found that plaintiff still tested low at

---

[2] These Findings and Recommendations, were adopted by Order, filed March 30, 2007.

[3] Now CDCR.

[4] "Authorized staff. Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their licensure, to diagnose illness or, prescribe medication and health care treatment for inmates. No other personnel or inmates may do so." CAL. CODE REGS. tit.xv, § 3354(a).

71, and found that plaintiff was having a "reaction." Complaint, p, 3, Exhibit 1-A. Once plaintiff began experiencing the insulin reaction, he required immediate caloric intake, and defendant Lee provided plaintiff no assistance. Complaint, pp, 3-4.

Defendants J. Herrera, S. O'Ran, G. Thumser, T. Schwartz, K. Allen, and N. Grannis all denied plaintiff's appeals, relating to defendant Lee's conduct and the resulting RVR, through the Director's Level. Complaint, p. 4. Lee's acts were apparently justified because he was following orders of defendant K. Providence, CMF Correctional Lieutenant, who was in turn acting on orders of defendant W. Fisher, another Corr. Lt. assigned as third watch commander on 8/16/03. These orders were based on an institutional memorandum authored by defendant W. Bradanick on March 16, 2000, which had not been applied to plaintiff previously due to his individually medically necessary treatments. Complaint, p. 5; Exhs. 4-6, 8. Plaintiff had been granted "preferential movement," i.e., his treatment was contrary to, or an exception to, the Bradanick memo, which exception had been renewed repeatedly through August 19, 2003, and, thus, was still in effect at the time of plaintiff's 8/16/03 insulin reaction and defendant Lee's misconduct. Id., pp. 5-6, Exhs. 4-6, 9. The Bradanick memo, dated 3/16/2000, restricts inmate movement, including those inmates going to the B-1 Clinic for finger sticks, by having them released "**only** when their respective wing is released for the morning or evening meals,"[5] apparently for the purpose of ameliorating "mass movement and security problems with inmates inside of and outside of the B-1 Clinic area." Exh. 8 to complaint. Notwithstanding the memo, on September 1, 2000, plaintiff was found by the Chief Medical Officer Andreasen (not a defendant) to meet the requirements to be released as a brittle diabetic for fasting blood sugar tests. Complaint, p. 14, Exh. 5. Plaintiff's medical chrono, CDC 128-C, signed by non-defendants, Dr. Mark Altcher and Dr. Joseph Bick, Chief Medical Officer (CMO), was dated August 20, 2002, and was to remain in effect for one year, until August 19, 2003, and stated in relevant part: "Due to diabetes, he [plaintiff], needs to get to B-1 Clinic at 0630 and 1715 hours for fingersticks and insulin treatments, and should go the dining hall immediately thereafter." Exh. 4 to complaint.

Plaintiff is a Type I brittle diabetic, a condition recognized as a disability under the ADA. Compl., pp. 11-13. Defendant Fisher stopped the brittle diabetic release program in early 2003, focusing in a discriminatory manner only on diabetics. Id., p. 15. Evidence that defendant Fisher prevailed upon CMO Bick to exclude the release times is apparent in plaintiff's CDC-128 chrono, dated August 3, 2003, to remain in effect until August 4, 2004, wherein plaintiff's Type 1 brittle diabetic condition and requirements are

---

[5] Emphasis in original.

> set forth but no release times for fasting blood sugar tests are identified, although such times had been specified in the four preceding years. Id. Plaintiff asks that the CMF reinstate the brittle diabetic release program, seeking only prospective injunctive relief from the entity defendants, CDC and CMF-Vacaville, including renewal of his CDC-128-C medical chronos on a yearly basis, to be released for timely medical testing and treatment and assurances that staff will respond appropriately to plaintiff's emergency medical calls. He seeks money damages, including punitive damages, from the individual defendants.

Supplemental Motion for Summary Judgment

*Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set forth in Fed. R. Civ. P. 56(c) is met. "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry

of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S.

at 587, 106 S. Ct. at 1356. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1356 (citation omitted).

On December 23, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

*Undisputed Facts*

The following facts are undisputed.[6] See defendants' separate statement of undisputed material facts in support of supplemental motion, pp. 2-5; see also, plaintiff's statement of undisputed/disputed facts in opposition, pp. 16-18: 1) On August 16, 2003, plaintiff was an inmate incarcerated at the California Medical Facility in Vacaville (CMF). 2) Plaintiff uses a wheelchair to ambulate.[7] 3) Plaintiff is subject to falling in open areas. 4) Plaintiff is a Type 1 diabetic.[8] 5) Plaintiff's medical condition prevents him from standing or walking "for very long." He has an orthotic brace for his right leg and requires a cane and crutches. 6) Plaintiff is unable to navigate in a dormitory environment due to chronic degenerative knee changes. 7) In the past, CMF allowed diabetics early release to get to the

---

[6] The numbering of the facts the court deems undisputed does not consistently correspond with the numbering of defendants' version of the undisputed facts.

[7] Plaintiff avers that he uses a wheelchair "part of the time" to move.

[8] Plaintiff modifies this to being a Type 1 "brittle" diabetic.

clinic prior to meal times; specifically, plaintiff's previous medical chronos permitted him early release to the clinic to get finger-tested prior to eating.  8) Currently, diabetic inmates are released to the clinic only at meal times and are not allowed early release for finger-sticks.  9) Plaintiff became aware of the policy change prohibiting diabetic inmates' movement to the clinic prior to meals in May or June of 2003.  10) On August 16, 2003, (former defendant) Officer Lee was the correctional officer (C/O) assigned to the unit in which plaintiff was housed.  11) At 5:15 p.m. on August 16, 2003, plaintiff told C/O Lee he needed to go to the clinic or eat.  12) C/O Lee told plaintiff that release for chow would be soon and that would be the time for plaintiff to go to the clinic.  13) At 5:20 p.m., plaintiff made a "Man Down" call to which C/O Lee responded.  14) Plaintiff does not know what C/O Lee observed concerning plaintiff's condition in responding to plaintiff's call.  15) At 5:30 p.m., plaintiff was released from his cell along with other inmates in his wing for the evening meal.  16) Plaintiff went to the clinic and received a blood sugar test that showed a blood sugar level of 52.  About twenty minutes later and after eating, plaintiff's blood sugar level was re-tested and measured 71.  Plaintiff's Deposition, pp. 17: 19-22.

Although plaintiff again seeks to take issue with facts deemed undisputed in the adjudication of the prior motion for summary judgment, as plaintiff proffers a similarly inadequate basis for disputing them, the court sets them forth herein as additional undisputed facts: 17) The number of diabetic inmates who need finger-stick tests before eating at CMF are between 140 and 150.  MSJ, Exh. B, CMF Custody Captain M. Kaplan, ¶ 2.  18) The policy change that restricted the early release of diabetic inmates was implemented to address movement and security concerns.  Id. at ¶ 3.  19)  There is no evidence in his medical record that plaintiff suffered any permanent injury from the incident of August 16, 2003.  Declaration of Chief Medical Officer (CMO) Bick, ¶ 7, filed on Jan. 29. 2007. [9]

---

[9] Defendants have once again submitted an unsworn declaration from Dr. Bick, see note 2 of the exhaustive Findings and Recommendations, filed on 2/20/07, referencing the fact that in

*ADA*

Title II of the ADA prohibits a public entity from discriminating against a qualified individual with a disability on the basis of a disability. 42 U.S.C. § 12132 (1994); Weinrich v. L.A. County Metro Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997). To state a claim under Title II, the plaintiff must allege four elements: 1) the plaintiff is an individual with a disability; 2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; 3) the plaintiff was either excluded from participation in or denied the benefits by the public entity; and 4) such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability. Weinrich, 114 F.3d at 978.

*Argument*

Defendants CDCR and CMF frame the remaining issue succinctly as plaintiff's claim for injunctive relief under the ADA in the form of allowing plaintiff to renew a medical chrono permitting plaintiff to get a finger-stick diabetic test before the rest of his housing unit is released for meals. MSJ, p. 2. Defendants maintain, however, that to the extent that plaintiff is a class member, under Armstrong v. Davis, et al., No. CIV 94-2307 CW (N.D. Cal), he is barred from seeking prospective injunctive relief under the ADA because what is at issue herein is already subject to enforcement by the court via the class action. MSJ, pp. 2, 4, citing Gillespie v. Crawford, 858 F.2d 1101, 1103 (5th Cir. 1988); McNeil v. Guthrie, 945 F.2d 1163, 1165 (10th Cir. 1991). See also Crawford v. Bell, 599 F.2d 890, 892-93 (9th Cir. 1979); Choyce v. Saylor, 2007 WL 3035406 (N.D. Cal. 2007); Jacobson v. Schwarzenegger, 351 F. Supp. 1198, 1209 (C.D.Cal. 2004). Further, defendants argue that plaintiff fails to state an ADA claim because the undisputed facts demonstrate plaintiff was not denied access to a service, program or activity and

---

their initial summary judgment motion, defendants submitted, inter alia, an unsworn declaration from CMO Bick, but later submitted a modified sworn declaration. The previously submitted modified Bick declaration is missing paragraphs 3-6, probably inadvertently. Rather than vacate the supplemental motion, in the interest of judicial economy, the court will refer only to the modified sworn declaration, filed on January 29, 2007, referenced in the prior motion.

was not discriminated against solely by reason of a disability. Id. This alternative assertion, of course, is inconsistent with an assertion that an ADA class action encompasses plaintiff's claims.

Defendants state that a consent decree was entered in Armstrong, following the 1994 lawsuit on behalf of present and future state prisoners and parolees alleging violations of the ADA and Rehabilitation Act (RA),[10] for which defendants were found to have acted in violation of the ADA, 42 U.S.C. § 12131, et seq., and § 504 of the RA; a remedial order was entered on September 20, 1996, mandating implementation of the CDC's (now CDCR's) Disability Placement Plan (DPP), of which the court takes judicial notice.[11] MSJ, p. 4, & Attachment A, Remedial Order. Defendants further state that the Armstrong Remedial Plan sets out the CDCR's policy to provide access to CDCR programs and policies to inmates and parolees who have disabilities, "with or without reasonable accommodation, consistent with penological interests." MSJ, p. 5, & Attachment B, Armstrong Remedial Plan, of which the court also takes judicial notice, dated January 8, 1999, p.1, and amended plan, dated Jan. 3, 2001.

The Remedial Plan states that "[n]o qualified inmate or parolee with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the Department or be subjected to discrimination." MSJ, Attachment B, Amended Remedial Plan, p. 43. "Disability" is defined under 42 U.S.C. § 12102 (2):

> The term "disability" means, with respect to an individual--
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

---

[10] 29 U.S.C. § 794(a).

[11] Judicial notice may be taken of court records. Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981).

1         Under <u>Scope</u> of the Remedial Plan (Amended), the following is set forth:

2         The Disability Placement Program (DPP) is the Department's set of plans, policies, and procedures to assure nondiscrimination against inmates/parolees with disabilities.  The DPP applies to all of the Department's institutions/facilities, all programs that the Department provides or operates, and to all inmates who have disabilities that affect a major life activity whether or not the disabilities impact placement.

        Although the program covers all inmates/parolees with disabilities, whether or not they require special placement or other accommodation, it is facilitated in part through "clustering" or designating accessible sites (designated facilities) for qualified inmates requiring special placement.  Inmates with permanent mobility, hearing, vision, and speech impairments, or other disability or compound conditions severe enough to require special housing and programming, will be assigned to special placement in a designated DPP facility.  Inmates with a permanent impairment of lesser severity, learning disability, or a kidney disability, may be assigned to any of the Department's institutions/facilities (designated DPP institutions or nondesignated DPP institutions) consistent with existing case factors.

MSJ, Attachment B, p. 43.

        Under Part II, <u>Standards</u>, of the Remedial Plan (Amended):

        A "qualified inmate/parolee" is one with a permanent physical or mental impairment which substantially limits the inmate/parolee's ability to perform a major life activity.  Major life activities are functions such as caring for one's self, performing essential manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

MSJ, Attachment B, p.43.

        A "permanent disability or impairment" is defined as "one which is not expected to improve within six months."  Id. at 44.  Categories for special placement are enumerated as "permanent mobility impairments;" "permanent hearing impairments;" "permanent vision impairments;" "permanent speech impairments;" and "other."  Id. at 44-45.  Coming under "permanent mobility impairments" are "inmates/parolees who use wheelchairs full or part time due to a permanent disability" and "nonwheelchair" users which include inmates and parolees "who do not require a wheelchair but who have a permanent lower extremity mobility

impairment that substantially limits walking; i.e., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without pausing with the use of aids, i.e., crutches, prosthesis, or walker...." Id. "Other" signifies "those inmates/parolees with a disability other than those specified above, e.g., emphysema or other upper respiratory condition, which due to the severity of their disability may require special placement in a designated DPP facility." Id. at 45.

Defendants maintain that the undisputed facts, nos. 2 through 6 above, for which plaintiff provides supporting documentation demonstrate that plaintiff has a mobility impairment which puts him in the Armstrong plaintiff class. MSJ, p. 6. Defendants do note that plaintiff alleges that he is disabled due to his Type 1 diabetes and that the entity defendants failed to accommodate that particular disability, nevertheless, they contend that, as a member of the Armstrong class, his injunctive relief request "falls squarely under Armstrong." MSJ, p. 6, citing Crayton v. Terhune, No. 98-4386, 2002 WL 310093590 * 4 (N.D. Cal. Sept. 17, 2002).

In Crayton, supra, in order for defendants to prevail on summary judgment the court made clear that defendants had to provide specific supporting documentation, i.e., a copy of the consent decree and forms which documented Crayton's disabled status. Plaintiff's failure, therein, to provide contrary evidence that his claims, inter alia, of denial of access to his orthomodified typewriter and to the prison law library, were not encompassed by Armstrong, failed to raise a genuine issue of material fact as to Armstrong's application to him. Crayton, supra, *4. Having found plaintiff to be an Armstrong class member whose injunctive relief claims under the ADA/RA were encompassed within Armstrong, Crayton was required to "pursue his request via the consent decree or through class counsel." Id.

As the court set forth in its prior order, filed on September 4, 2007, a plaintiff who is a member of a class action for equitable relief from prison conditions may not maintain a separate, individual suit for equitable relief within the same subject matter of the class action. Gillespie v. Crawford, supra, 858 F.2d at 1103, (en banc) (adopting a rule "similar to that of the

13

Sixth and Eighth Circuits," precluding individual lawsuits for equitable relief by class action members, averring that such actions "would interfere with the orderly administration of the class action and risk inconsistent adjudications")[12]; see also, McNeil v. Guthrie, supra, 945 F.2d at 1165-1166 (10th Cir. 1991) (precluding individual lawsuits for injunctive relief alleging unconstitutional prison conditions when there is an existing class action); Rouser v. White, No. CIV S-93-0767 LKK GGH P, 2006 WL 1897125, at *2 (E.D. Cal. 2006); and other cases cited infra.

While not disputing that he is mobility impaired and on that basis a member of the Armstrong class, plaintiff herein takes strong issue with the applicability of Armstrong to his claim arising from his Type 1 diabetic condition. Plaintiff argues that defendants failed to acknowledge his ADA claims in his prison grievances, failed to acknowledge his diabetic condition as a recognized disability under the ADA and that the Armstrong Remedial Plan itself fails to specifically address diabetics. Opposition (Opp.), pp. 7, 21-31. Plaintiff maintains that at this time he knows of no other of the diabetic CMF inmates who suffers from the severe form of diabetes that he has, brittle diabetes, and that his condition has "worsened exponentially as a result of the movement restriction policy." Id. at 8. Plaintiff further contends that defendants reference only his need for testing blood sugar and not his insulin dependence. Id. Plaintiff argues that defendants' efforts to integrate his mobility impairment with his diabetes demonstrates that defendants do not recognize his diabetes as an ADA-protected disability. Id. at 9, 21-31. Plaintiff contends that when plaintiff made his ADA claims via prison grievance, defendants should have alerted him to the need for him to seek a remedy via the Armstrong class action, but failed to do so. Id. at 10.

\\\\\

---

[12] The Gillespie Court found that individual class members could pursue equitable relief claims "by urging further action through the class representative and attorney, including contempt proceedings, or by intervention in the class action." Id.

1  Plaintiff avers that his brittle diabetic condition is one which requires more
2  intensive treatment. Opp., p. 14, citing Erjavac v. Holy Family Health Plus, 13 F. Supp.2d 737,
3  746 (N.D. Il. 1998), an employee disability discrimination case finding that insulin dependent
4  diabetes in its untreated form "meets all three prongs of the ADA's disability definition," and
5  noting plaintiff Erjavac's physician's testimony that plaintiff's "diabetes is brittle, meaning that
6  her blood sugar levels fluctuate wildly and are unstable" and "[i]f not moderated properly by
7  insulin injections...a sharp drop in Erjavac's blood sugar levels can put her in a coma."

8  The gravamen of what plaintiff argues for in his ADA claim for injunctive relief is
9  that he be permitted to leave early to have his blood tested prior to eating, as he had been
10 permitted in the past, prior to the implementation of the policy prohibiting early release of
11 diabetics for finger-testing. What is at issue in this motion is the narrow question of whether or
12 not plaintiff's injunctive relief claim is prohibited outside of the Armstrong class action.
13 Although defendants point to no portion of the Armstrong Remedial Plan that specifically
14 addresses whether plaintiff's diabetic condition is a recognized ADA disability therein or
15 whether, as an ADA-qualified inmate, plaintiff's equitable claims regarding his diabetic
16 condition would be encompassed within it, the broad language of the scope of the plan
17 sufficiently resolves the question that if plaintiff is recognized as suffering from a mobility
18 impairment under the ADA and to that extent embraced within Armstrong, any injunctive relief
19 he might seek for a medical condition not plainly related to the broad categories specified should
20 be pursued via the class action. Moreover, the severity of plaintiff's diabetes would surely
21 qualify for consideration as an "other" impairment which "may" require placement in a
22 designated DPP facility.

23 As the undersigned observed in the 9/04/07, Order, permitting defendants' belated
24 supplemental dispositive motion, in McNeil, supra, at 1166 n.4, the Tenth Circuit notes two
25 exceptions to the prohibition of individual lawsuits by class members where there is a class
26 action: 1) where the individual seeks equitable relief for claims not litigated within the class

1  action's boundaries; and 2) where money damages are sought. Id., at 1166 n. 4. It is the very
2  expansive breadth of the "Other" category included in the Armstrong Remedial Plan that
3  demonstrates that it is meant to embrace any serious medical condition of ADA-qualified
4  inmates. This court finds that these defendants are bound by procedures as a result of the class
5  action at issue that fully encompass any relief this court could order rendering the injunctive
6  relief sought by this action moot. See e.g., Pierce v. County of Orange, 526 F.3d 1190, 1206,
7  1207 (9th Cir. 2008).

        Accordingly, IT IS ORDERED that:

        1. Defendants' motion, filed on 2/06/08 (# 79), to strike plaintiff's "counter" (cross) motion for summary judgment, 1/18/08 (# 78) is granted; and

        3. Plaintiff's defective cross motion for summary judgment, filed on 1/18/08 (#78) is stricken.

        IT IS HEREBY RECOMMENDED that the entity defendants' supplemental motion for summary judgment, filed on 10/02/07, as to the remaining ADA injunctive relief claims be granted and judgment be entered for defendants.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 07/21/08          /s/ Gregory G. Hollows

        GREGORY G. HOLLOWS  
        UNITED STATES MAGISTRATE JUDGE

GGH:009 - stri1530.msjsup